UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Allen Rheaume,

        Plaintiff,

        v.                                    Civil Action No. 2:15-cv-135-wks-jmc

Andrew Pallito, Mark Potanas,
Cullen Bullard, Kris Goldstein,
Samantha Clarke, Kim Bushey,
Jim Gibson, Dale Crook,
Larry Martineau, Tammy Kennison,
and Brad Dunsmore,

        Defendants.

## REPORT AND RECOMMENDATION
### (Doc. 68)

      Plaintiff Allen Rheaume, a Vermont inmate proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983, seeking compensatory and punitive damages against Defendants Andrew Pallito, Mark Potanas, Cullen Bullard, Kris Goldstein, Samantha Clarke, Kim Bushey, Jim Gibson, Dale Crook, Larry Martineau, Tammy Kennison, and Brad Dunsmore, each an employee of the Vermont Department of Corrections (DOC).  Rheaume alleges that Defendants unlawfully delayed or denied his entry into sex offender programming in retaliation for Rheaume's prior grievances and state and federal litigation against them.  According to Rheaume, Defendants' conduct violates his First and Fourteenth Amendment rights under the United States Constitution.

Pending before the Court is Defendants' Motion to Dismiss Rheaume's Second Amended Complaint for failure to state a claim.  (Doc. 68.)  Rheaume opposes the Motion.  (Docs. 70–74, 76.)  For the reasons stated below, I recommend that Defendants' Motion to Dismiss be GRANTED in its entirety.

**Factual Background and Complaint Allegations**

Rheaume was convicted of lewd and lascivious conduct and is serving a life sentence as a habitual offender.  *Rheaume v. Pallito*, Civil Action No. 5:11–cv–72, 2012 WL 6642706, at *1 (D. Vt. Nov. 15, 2012).  A recent Vermont Supreme Court decision noted that Rheaume "has [48] convictions, [5] of which either involve sex crimes or have a sexual element.  He also has had [63] disciplinary report convictions while incarcerated."  *Rheaume v. Pallito*, 2011 VT 72, ¶ 3, 190 Vt. 245, 30 A.3d 1263.  Rheaume has previously filed a § 1983 action in this Court against some of the same Defendants in this action.  (Doc. 57 at 3 (citing *Rheaume v. Pallito*, 5:11-cv-72).)  That action primarily involved Rheaume's allegation that his designation as a high-risk sex offender was unconstitutional.[1]  (*Id.*)

Unless otherwise noted, the following facts are derived from Rheaume's Second Amended Complaint, the contents of which are accepted as true for purposes of the pending Motion to Dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  Rheaume alleges that, since his minimum release date of January 30, 2008, he

---

[1]  Of note, Rheaume himself moved to dismiss that action in January 2014, *after* a Report and Recommendation was issued recommending that Rheaume's Motion for Summary Judgment be denied and the defendants' Cross-Motion for Summary Judgment be granted.  (*See* ECF Case No. 5:11-cv-72, Docs. 145, 146, 148.)

has been a Level B offender and eligible for treatment in the Vermont Treatment Program

for Sexual Abusers (VTPSA).  (Doc. 57 at 3, 6, 7.)  In May 2014, however, Rheaume was

denied parole by the Vermont Parole Board because he had not completed the VTPSA

sex offender program.  (*Id.* at 5, ¶ 10.)  In June 2014, a psychologist gave Rheaume a

"positive recommendation" for the VTPSA program after Rheaume had completed a

psychosexual assessment indicating that he "was not in denial and would benefit from the

. . . program."  (*Id.* ¶ 9.)  Despite this recommendation, in September 2014, Defendant

Bullard, the director of classification at the DOC, arbitrarily and incorrectly designated

Rheaume a Level C offender, closing all programming opportunities to Rheaume.  (*Id.*

at 4, ¶¶ 3–4.)  In October 2014, Rheaume grieved Bullard's Level C designation to the

DOC and then filed a "VRCP Rule 65 Injunction" in the Vermont Superior Court

contesting the designation.  (*Id.* ¶ 5.)  At a November 2014 "Central Office Case

Staffing," Bullard "was forced to remove" the Level C designation because Rheaume's

offense "did not contain the needed elements of violence for [that] designation."  (*Id.*

at 4–5, ¶ 6.)  Also at that Central Office Case Staffing, Defendants Bullard, Goldstein,

Bushey, Clarke, Gibson, Kennison, Crook, and Martineau decided to "[never] release

[Rheaume] into the community on [any] type of release status," "not to hold another

cent[r]al office case staffing [on Rheaume] for . . . two years," and "not to allow

[Rheaume] to participate in the VTPSA sex offender treatment, thus making [him]

ineligible for parole."  (*Id.* at 5, ¶ 7.)

Rheaume alleges that Defendants made these decisions at the Central Office Case

Staffing in retaliation for his prior state and federal litigation against them, and thus in

3

violation of his First Amendment right to access the courts and his Fourteenth Amendment substantive and procedural due process rights. (*Id.* at 3–4, 6–8.) Moreover, Rheaume asserts that Defendants acted "with deliberate indifference" to his liberty interest in participating in the VTPSA, depriving him of that interest "in such a way as to shock the conscience." (*Id.* at 4, ¶ 2.)

Rheaume further alleges that Defendant Dunsmore, a caseworker at the Northwest State Correctional Facility (NWSCF), "illegally complete[d] a Violent Risk Appraisal Guide[] (VRAG) assessment on [Rheaume's] current offense . . . and designated [Rheaume] a high[-]risk violent offender." (*Id.* at 6, ¶ 14.) Rheaume claims that "Dunsmore was not an authorized psychologist and forensic expert to complete a VRAG assessment on [Rheaume]" during the years 2005 through 2007. (*Id.* ¶ 15.) Finally, Rheaume alleges that "Defendant Pallito is liable for failing to properly train and [s]upervise" the other Defendants with respect to the above actions. (*Id.* ¶ 16.)

Rheaume seeks monetary damages, both punitive and compensatory, against Defendants for their retaliation against him and for their delay or denial in allowing him to participate in sex offender programming.[2] (*Id.* at 9, ¶ 1.) He also seeks "punitive and

---

[2] Confusingly, Rheaume states in his Opposition to Defendants' Motion to Dismiss that the "illegal actions" of Defendants "pertain[] to [their] *denial* of [his] ent[]rance into [sex offender programming] and the 2[-]year *delay* of entrance into the . . . program," making it unclear whether Rheaume asserts that Defendants denied, or merely delayed, his entrance into sex offender programming, a significant point. (Doc. 70 at 4 (emphases added); *see* Doc. 57 at 6, 9 (alleging that Defendants both denied and delayed Rheaume's entry into sex offender programming).) *See, e.g.*, *Conkleton v. Zavaras*, Civil Action No. 08–cv–02612–WYD–MEH, 2010 WL 6089079, at *5 (D. Colo. Oct. 6, 2010) (alleged 20-month delay in plaintiff's continuation of sex offender program does not give rise to a "cognizable liberty interest," particularly when delay was caused by plaintiff's own conduct), *report and recommendation adopted in* Civil Action No. 08–CV–02612–WYD–MEH, 2011 WL 839282 (D. Colo. Mar. 7, 2011). Given the liberal pleading standard, I treat the Second Amended Complaint as alleging that Defendants denied Rheaume entry into sex offender programming.

compensatory damages against Defendant Dunsmore for his unauthorized and arbitrary 7-High Risk violent offender VRAG assessment," and against Defendant Pallito "for his failure to properly train and supervise" the other Defendants.  (*Id.* ¶¶ 2–3.)

### Procedural History

Rheaume filed his initial Complaint on June 18, 2015.  (Doc. 5.)  On July 7, 2015, he filed a First Amended Complaint.  (Doc. 10.)  On August 27, 2015, Defendants moved to dismiss the First Amended Complaint.  (Doc. 47.)  Days later, Rheaume filed a motion seeking leave to amend the Complaint for a second time.  (Doc. 49.)  On October 20, 2015, considering the liberal standard for granting leave to amend *pro se* pleadings, this Court granted Rheaume leave to amend the First Amended Complaint and accepted the Second Amended Complaint for filing.  (Doc. 56.)  Given this filing, the Court denied Defendants' Motion to Dismiss the First Amended Complaint, finding that it was moot. (Docs. 58, 63.)

On December 14, 2015, Defendants filed the pending Motion to Dismiss the Second Amended Complaint.  (Doc. 68.)  Therein, Defendants make the following arguments: (1) Rheaume's official capacity claims seeking monetary damages against Defendants are barred by Eleventh Amendment sovereign immunity; (2) Rheaume does not allege sufficient facts showing that Defendants Pallito and Potanas were personally involved in the alleged unlawful conduct; (3) Rheaume fails to allege a violation of his First Amendment rights, given that he has not alleged facts indicating that Defendants delayed or denied his participation in sex offender programming *due to* Rheaume's filing of lawsuits or grievances against them; (4) Rheaume fails to allege a violation of his

Fourteenth Amendment rights, given that he does not have a liberty interest in sex offender programming; and (5) the facts alleged do not rise to the standard required for a punitive damages claim under § 1983.  (*Id.*)  In their Reply, Defendants respond to Rheaume's claims regarding Defendant Dunsmore's alleged unlawful completion of the VRAG, arguing that these claims lack merit because they are based on the DOC's programming decisions and Rheaume does not have a liberty interest in sex offender programming.  (Doc. 75 at 1–2.)

Not only has Rheaume filed an opposition to Defendants' Motion (Doc. 70), he has also submitted facts and evidence not stated in the Second Amended Complaint, including a "Supplemental Pleading . . . Specifically Addressing [His] Liberty Interest in Sex Offender Treatment" (Doc. 72), his own "Declaration in Support of His May 1, 2014 Vermont Parole Board Review and Findings" (Doc. 73), and documents related to his appeal of a grievance to the Commissioner of Corrections (Docs. 74-1, 76-1).  In its analysis, the court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).  Although "[c]onsideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion[,]" particularly in the *pro se* context, such materials must be "integral to the complaint[;] it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document[s]"; and there must be "no material disputed issues of fact regarding the relevance of the document[s]."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)

(internal quotation marks omitted).  I have reviewed Rheaume's submissions, as
Defendants have not objected to their admission and my consideration of them does not
prejudice Defendants.

<u>**Discussion**</u>

Rheaume brings this action under 42 U.S.C. § 1983, which provides a civil claim
for damages against "[e]very person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any
citizen . . . to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws . . . ."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state
actors from using the badge of their authority to deprive individuals of their federally
guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*,
504 U.S. 158, 161 (1992).  "Section 1983 itself creates no substantive rights; it provides
only a procedure for redress for the deprivation of rights established elsewhere."  *Thomas
v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*,
471 U.S. 808, 816 (1985)).  To succeed on a § 1983 claim, a plaintiff must establish that:
"(1) the defendant acted under color of state law; and (2) as a result of the defendant's
actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional
rights or privileges."  *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

## I.      Rule 12(b)(6) Standard

As noted above, the case is before the Court on Defendants' Motion to Dismiss for
failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  To survive a
motion to dismiss under Rule 12(b)(6), a complaint must "provide the grounds upon

which [its] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98
(2d Cir. 2007).  A plaintiff must also allege "enough facts to state a claim to relief that is
plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009).  As described by the United States Supreme Court in *Iqbal* and *Twombly*, this
does not require a plaintiff to provide "detailed factual allegations" to support his claims,
but the "[f]actual allegations must be enough to raise a right to relief above the
speculative level." *Twombly*, 550 U.S. at 555.  The plaintiff must allege sufficient facts
to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556
U.S. at 678.  If the plaintiff "ha[s] not nudged [his] claims across the line from
conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

 In assessing the adequacy of the pleadings, the court must accept all factual
assertions as true and draw all reasonable inferences in favor of the plaintiff.  *See Wilson
v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011); *ATSI Commc'ns*,
493 F.3d at 98.  The court need not, however, credit the complaint's "legal conclusions"
and "[t]hreadbare recitals of the elements of a cause of action[ which are] supported by
mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metro. Life Ins.
Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory
allegations or legal conclusions masquerading as factual conclusions." (internal quotation
marks omitted)).

Even after *Iqbal* and *Twombly*, in cases like this which involve a *pro se* plaintiff,

the court must construe the complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009), reading it "to raise the strongest arguments . . . suggest[ed therein],"

*Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation marks

omitted).  "This policy of liberally construing *pro se* submissions is driven by the

understanding that '[i]mplicit in the right of self-representation is an obligation on the

part of the court to make reasonable allowances to protect *pro se* litigants from

inadvertent forfeiture of important rights because of their lack of legal training.'"

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth

v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  Thus, in assessing *pro se* complaints challenged

by Rule 12(b)(6) motions to dismiss, courts "apply[ ] a more flexible standard to evaluate

their sufficiency than we would when reviewing a complaint submitted by counsel."

*Lerman v. Bd. of Elections in the City of N.Y.*, 232 F.3d 135, 139–40 (2d Cir. 2000).

"This is particularly so when the *pro se* plaintiff alleges that h[is] civil rights have been

violated."  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Nonetheless, even *pro se* litigants "remain subject to the general standard applicable to all

civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal*."

*Brickhouse v. City of New York*, No. 09 CIV. 9353(NRB), 2010 WL 3341845, at *2

(S.D.N.Y. Aug. 16, 2010); *see Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-

5416-cv, 2008 WL 4951045, at *1 (2d Cir. Nov. 20, 2008); *Triestman*, 470 F.3d at 477

("[P]ro se status does not exempt a party from compliance with relevant rules of

procedural and substantive law." (internal quotation marks omitted)).

9

## II.    Official-Capacity Immunity

Defendants first argue that Rheaume's claims against them for monetary damages in their official capacities are barred by the doctrine of sovereign immunity under the Eleventh Amendment of the United States Constitution.  (Doc. 68 at 4–6.)  The Eleventh Amendment generally prohibits plaintiffs from recovering damages from state officials in their official capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (stating claim for damages against state officials in their official capacity is considered to be a claim against the state and is thus barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, (1984) (noting agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Darcy v. Lippman*, 356 F. App'x 434, 436–37 (2d Cir. 2009) ("The Eleventh Amendment . . . bars [plaintiff] from pursuing a claim for damages against the individual defendants in their official capacities."); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (collecting cases).  Exceptions to this general rule apply when there has been an explicit and unequivocal waiver of immunity by a state, or a similarly clear abrogation of the immunity by Congress.  *See Graham*, 473 U.S. at 169; *Pennhurst*, 465 U.S. at 99.

The State of Vermont has not waived its Eleventh Amendment sovereign immunity.  In fact, the Vermont Legislature has specifically preserved the State's immunity under that Amendment.  *See* 12 V.S.A. § 5601(g) (Vermont Tort Claims Act reserves Eleventh Amendment immunity for all claims not specifically waived).  It is also well settled that Congress did not abrogate state sovereign immunity by enacting § 1983.

10

*See Quern v. Jordan*, 440 U.S. 332, 340–42 (1979).  Accordingly, Rheaume's claims for money damages against Defendants in their official capacities should be DISMISSED.

## III.    Fourteenth Amendment Due Process Claim

Defendants argue that Rheaume has failed to state a claim for relief under the due process clause of the Fourteenth Amendment because he has no liberty interest in attending sex offender programming.  (Doc. 68 at 12–14.)  For the reasons discussed below, I agree.

### A.    Procedural Due Process

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property[ without due process of law,] and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)).  "[S]tandard analysis under [the Due Process Clause] proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  Thus, in evaluating due process claims, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution."  *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) (alteration in original) (internal quotation marks omitted).

The United States Supreme Court has stated that prisoners do not have a liberty interest under the Federal Constitution in "prisoner classification and eligibility for

rehabilitative programs in the federal system." *Moody v. Daggett*, 429 U.S. 78, 88 n.9

(1976); *see also Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir. 1980).  In *Sandin v.*

*Conner*, the Supreme Court ruled that, although states may under certain circumstances

create liberty interests which are protected by the Due Process Clause, *see Bd. of Pardons*

*v. Allen*, 482 U.S. 369, 377–81 (1987), these interests will be generally limited to

freedom from restraint which "imposes atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. 472, 484 (1995).

"Courts considering inmate claims regarding [the] denial of participation in or access to

prison programs or privileges under *Sandin* have uniformly concluded that inmates do not

enjoy a protected liberty interest in such aspects of prison life."  *Thompson v. LaClair*,

No. 9:08–CV–0037 (FJS/DEP), 2009 WL 2762164, at *5 (N.D.N.Y. Aug. 25, 2009); *see*

*Williams v. Bailey*, Civ. Action No. 9:09–CV–0643 (DNH/DEP), 2010 WL 3881024,

at *4 (N.D.N.Y. Sept. 3, 2010) ("Because plaintiff cannot establish the existence of a

protected liberty interest or a guaranteed right to participate in prison programming, his

allegation that he was deprived of due process stemming from the defendants' failure to

provide such programming fails to state a plausible due process claim.").

     This Court has very recently considered the issue of whether an inmate may

challenge the DOC's sex offender programming decisions, and determined that he may

not.  *See Rosen v. Pallito*, No. 2:13-CV-277, 2015 WL 4665628, at *3 (D. Vt. Aug. 6,

2015).  Specifically, in *Rosen v. Pallito*, the Court stated: "In general, Rosen may not

challenge the DOC's programming decisions, as *programming is strictly within the*

*discretion of the DOC and the Vermont Supreme Court has held that such decisions are*

12

*not reviewable*.  This principle holds true even when it results in a longer period of incarceration."  *Id.* (emphasis added) (citing *Inman v. Pallito*, 2013 VT 94, ¶ 18, 195 Vt. 218, 87 A.3d 449 ("Although plaintiff attempts to characterize the termination of his participation in [domestic abuse treatment program] as quasi-judicial, this is a programming decision that falls within the broad discretion that the DOC must have in order to decide the proper treatment for each inmate.  [The] DOC's decision to terminate an inmate from the . . . program is not a disciplinary action, but instead a programming decision within its discretion."); *State v. Cavett*, 2015 VT 91, ¶ 14, 126 A.3d 1287 (court could not review decision to terminate defendant's participation in the VTPSA because it was a programming decision, but it could review decision to revoke defendant's probation pursuant to 28 V.S.A. §§ 302 and 303)).  The Vermont Supreme Court case referenced in this quotation from *Rosen* is another of Rheaume's cases: *Rheaume*, 2011 VT 72, ¶¶ 9–10, where the Vermont Supreme Court held that Vermont trial courts have no jurisdiction to review the programming requirements of the DOC, even if they affect the length of an inmate's incarceration, because those requirements are administrative decisions within the DOC's discretion.  *See id.* ¶¶ 10–11 (stating court review of programming improper because DOC "is fulfilling . . . statutorily[ ]created responsibilities").

Also, in 2011, this Court considered whether Rheaume has a liberty interest in sex offender programming and decided that he does not.  *See Rheaume v. Pallito*, Civil Action No. 5:11–CV–72, 2011 WL 6934821, at *6 (D. Vt. Nov. 28, 2011), *Report and Recommendation adopted*, No. 5:11–CV–72, 2011 WL 6936201 (D. Vt. Dec. 30, 2011).

13

Specifically, in *Rheaume v. Pallito*, this Court dismissed Rheaume's claims regarding sex offender programming because "requiring Mr. Rheaume to participate in [sex offender] programming did not involve a liberty interest, and therefore did not deprive him of any due process rights." *Id.* Although that case involved claims that Rheaume was allegedly *required* to participate in sex offender programming, and this case involves Rheaume's allegation that he was *prevented* from participating in that programming, the analysis is essentially the same. *See Inman*, 2013 VT 94, ¶ 13 (finding "a distinction but no relevant difference" between case involving *termination* of participation in programming and case involving *requirement* to participate in programming, and stating: "The Commissioner has the power to review each inmate's program of treatment and to 'effect necessary and desirable changes' in such programming[ pursuant to] 28 V.S.A. § 102(c)(1), (c)(8). The use of the term 'termination' here is merely a label. Plaintiff is contesting a programming decision for which judicial review is unavailable under *Rheaume*.").

Other courts have similarly held that prisoners do not have a liberty interest in sex offender programming. For example, in *Wright v. Krom*, No. 10 Civ. 3934(RO), 2011 WL 4526405, at *3 (S.D.N.Y. Sept. 29, 2011), the court stated: "Plaintiff's allegations that Defendants improperly made program assignments based on his sexual offender status fail to raise a due process claim because prison . . . programs are not a protected liberty interest enjoyed by prison inmates." And in *Blake v. Fischer*, No. 09–CV–266 (DNH/DRH), 2010 WL 2522198, at *10 (N.D.N.Y. Mar. 5, 2010), *Report and Recommendation adopted*, No. 9:09–CV–266, 2010 WL 2521978 (N.D.N.Y. June 15, 2010), the court stated: "[C]ourts within the Second Circuit appear to be reaching a

consensus that recommendations for sex offender classification and programming do not trigger due process rights." *Id.*; *see also Fifield v. Eaton*, 669 F. Supp. 2d 294, 297 (W.D.N.Y. 2009) (granting motion to dismiss inmate's claim that he was denied parole opportunities due to his refusal to participate in sex offender counseling because inmate had no liberty interest in choosing programming); *Bertolo v. Benezee*, 601 F. App'x 636, 639 (10th Cir. 2015) ("[E]ven liberally construed, Bertolo's allegations could not constitute violations of his constitutional rights because he had no liberty interest in being enrolled in sex offender classes."); *Doe v. Heil*, 533 F. App'x 831, 841–42 (10th Cir. 2013) (concluding inmate failed to plead sufficient facts to establish a constitutionally protected liberty interest in continued sex offender treatment); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir. 1995) ("Prisoner classification and eligibility for rehabilitation programs in federal prisons are not directly subject to 'due process' protections." (citing *Moody*, 429 U.S. at 88 n.9)).

Moreover, Vermont has not created a liberty interest in sex offender programming, given that its applicable statutes and case law explicitly state that such programming is an act within the DOC's discretion. *See* 28 V.S.A. §§ 102(b)(2) (charging DOC with exercising supervisory power to establish and administer programs for treatment of inmates), 102(c)(8) (charging DOC with classifying inmates and establishing and reviewing a program for each inmate); *Rheaume*, 2011 VT 72, ¶ 11 ("[W]e believe the promulgation of programming requirements falls within the broad discretion of the DOC to determine what mode of treatment best serves individual inmates."). Rheaume argues that he has a liberty interest in sex offender programming because he has a liberty interest

in being released on parole (Doc. 70 at 16 (citing *Rheaume v. Pallito*, Civil Action No. 5:11–cv–72, 2012 WL 6642706, at *4–7 (D. Vt. Nov. 15, 2012))), and the VTPSA "is a prerequisite to the release of a sex offender on parole in Vermont" (*id.*).  But Rheaume submits no law, and I am aware of none, that supports the proposition that a Vermont inmate's attendance in the VTPSA is a prerequisite for parole.  The mere possibility that an inmate's participation in sex offender programming *may* result in the inmate being released on parole, is not enough to trigger a liberty interest in that programming.  *See, e.g.*, *Sandin*, 515 U.S. at 473 ("Conner's situation . . . does not present a case where the State's action will inevitably affect the duration of his sentence, since the chance that the misconduct finding will affect his parole status is simply too attenuated to invoke the Due Process Clause's procedural guarantees."); *Duemmel v. Fischer*, 368 F. App'x 180, 182 (2d Cir. 2010) (finding prisoner was not denied due process regarding his participation in sex offender treatment program because, although he alleged program was a requirement for parole eligibility, he did not allege program "create[d] a presumption of parole release"; his claim was not "one in which the defendant's actions will inevitably affect the duration of his sentence"; and he was repeatedly denied parole even after completing the program (internal quotation marks omitted)); *Thompson v. Thompson*, 145 F.3d 1333, 1998 WL 211775, at *1 (6th Cir. 1998) ("Although Thompson . . . argues that his disciplinary conviction may impact his future ability to earn good time credits that lead to earlier parole, such speculative, collateral consequences of a prison disciplinary conviction are insufficient to create a liberty interest[.]").

Furthermore, the Parole Board is not required to order the release of inmates based on their successful completion of sex offender programming.  As the Second Circuit explained: "The line between an interest that is constitutionally protected and one that is not, as being too ephemeral, contingent or speculative, is frequently difficult to determine.  Considerable weight is given to whether the alleged liberty interest is in the nature of 'a bird in the hand' rather than one in the bush."  *Pugliese*, 617 F.2d at 922. Rheaume's interest in attending sex offender programming, and being released on parole based on that attendance, is akin to a bird "in the bush," not one "in the hand."  *See Conway v. Gorczyk*, 171 Vt. 374, 379, 765 A.2d 463 (2000) (holding inmate imprisoned for lewd and lascivious behavior with a child "had no liberty interest in the *opportunity* to earn good-time credits, and thus was not entitled to procedural due process prior to being terminated" from cognitive self-change program (emphasis added)).

Under the applicable Vermont statute, an inmate may be released on parole only if "there is a reasonable probability that the inmate can be released without detriment to the community or to the inmate."  28 V.S.A. § 502a(b)(2).  As noted above, the Vermont Supreme Court stated in a 2011 decision that Rheaume has 48 convictions, 5 of which either involve sex crimes or have a sexual element, and 63 disciplinary report convictions while incarcerated.  *Rheaume*, 2011 VT 72, ¶ 3.  The Court also stated that, in 2007, the DOC's Sex Offender Review Committee designated Rheaume a "high-risk sex offender" under the applicable statute.  *Id.*  As also noted above, Rheaume contested that designation in a case before this Court, and the Court ultimately determined that summary judgment should be granted for the defendants regarding Rheaume's due

process claim alleging defective notice of his high-risk designation.  *See Rheaume v. Pallito*, Case No. 5:11-cv-72, Doc. 145 at 19 (filed 1/13/14).  The Court stated that, even assuming the Parole Board had denied parole to Rheaume on the basis of his high-risk designation, "[that] designation was not improper."  *Id.* at 20.[3]  Therefore, even if Rheaume was eligible for and attended the VTPSA, he cannot claim it is likely he would be paroled, given his assessed risk to the community.

In a "Supplemental Pleading" submitted by Rheaume after he filed his Opposition to Defendants' Motion, Rheaume cites to *Jones v. Puckett*, 160 F. Supp. 2d 1016, 1021–23 (W.D. Wis. 2001), and argues that "[t]hree Federal Court of Appeals Cases have held that *in certain circumstances*, classification as a sex offender implicates a liberty interest[], triggering due process protections."  (Doc. 72 at 1 (emphasis added).)  The cases cited in *Jones* for that proposition are distinguishable from this case, as they involve statutes that *mandate* inmates' participation in sex offender programming as a prerequisite for parole eligibility.  *See Jones*, 160 F. Supp. 2d at 1023–24 (citing *Neal v. Shimoda*, 131 F.3d 818, 824 (9th Cir. 1997); *Chambers v. Colorado Dep't of Corr.*, 205 F.3d 1237 (10th Cir. 2000); *Kirby v. Siegelman*, 195 F.3d 1285, 1292 (11th Cir. 1999)); *see also Beebe v. Heil*, 333 F. Supp. 2d 1011 (D. Colo. 2004) (holding that Colorado's statutory scheme establishing sex offender treatment as "an absolute prerequisite for release on parole" created a due process liberty interest in treatment);

---

[3]  More specifically, *Rheaume v. Pallito*, Case No. 5:11-cv-72, focused on Rheaume's allegations that his classification as a high-risk sex offender impacted his eligibility for sex offender programming or parole prior to the year 2038.  *See id.*, Doc. 145, at 7–8 ("According to Mr. Rheaume, [correctional] officials . . . concluded that he was not eligible for programming or parole until 2038.").

*Leamer v. Fauver*, 288 F.3d 532, 544 (3d Cir. 2002) (holding that New Jersey's statutory scheme predicating the term of a prisoner's sentence on the prisoner's response to treatment created a liberty interest in treatment).  Here, no Vermont statute mandates inmates' participation in sex offender programming as a prerequisite for parole; rather, as discussed above, the DOC has discretion in making such programming decisions. Moreover, the court in *Jones* ultimately determined that the prisoner plaintiff did *not* have a liberty interest in not being recommended for participation in sex offender treatment. *Jones*, 160 F. Supp. 2d at 1023.  The court explained:

> I am not persuaded by these appellate decisions that plaintiff has a liberty interest in not being identified in prison records as a person in need of sex offender treatment and in not having a recommendation for participation in treatment programs.  It is common for persons entering prison to have an evaluation of the reasons for their criminal behavior and their treatment needs, for the resulting evaluations to be recorded in their records and for the authorities who make programming and parole decisions to base their decisions in whole or in part on their sense of the effort a particular inmate has made to confront the problems that have been identified as contributing to his criminal conduct.  Because it is common procedure, plaintiff cannot argue that his evaluation and identification as a person in need of sex offender treatment is the "atypical and significant hardship on the inmate" that creates a liberty interest.

*Id.* (quoting *Sandin*, 515 U.S. at 484); *see also Simon v. Murphy*, No. C12–0979JLR–MAT, 2013 WL 2155658, at *8 (W.D. Wash. May 16, 2013) (where review board "retains discretion" over how much weight to give prisoner's lack of sex offender treatment, and Washington law does not "automatically prohibit" untreated sex offenders from being transferred to community custody, prisoner has no liberty interest in sex offender treatment).

Because Rheaume cannot establish the existence of a protected liberty interest in sex offender programming under the Due Process Clause of the Fourteenth Amendment, his claim that he was deprived of procedural due process stemming from Defendants' denial of or delay in providing such programming to him fails to state a plausible claim and should be DISMISSED.

### B.     Substantive Due Process

Rheaume also fails to state a plausible substantive due process claim.  Substantive due process protects individuals against government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citations and internal quotation marks omitted).  To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  As the Northern District of New York has observed, "[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process.  In *Sandin v. Conner*, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." *Lewis v. Murphy*, No. 9:12–CV–268 (NAM/CFH), 2013 WL 4520850, at *9 (N.D.N.Y. Aug. 26, 2013) (alteration in original) (internal quotation marks omitted).

20

For the reasons discussed above, delaying or denying Rheaume's enrollment in sex offender programming was not arbitrary, conscience-shocking, or oppressive, but rather, was rationally related to a legitimate penological purpose and was neither unnecessary nor painful.  Accordingly, Rheaume has failed to state a claim for violation of his right to substantive due process, and this claim should be DISMISSED.

## IV.     First Amendment Retaliation Claim

Despite Rheaume having no protected liberty interest in sex offender programming, a First Amendment retaliation claim could be alleged, given that the relevant question is not whether he has a liberty interest in programming but whether he was denied programming in retaliation for exercising a constitutional right.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  Defendants argue that Rheaume's First Amendment retaliation claim should be dismissed because the Second Amended Complaint does not sufficiently allege that Defendants denied or delayed Rheaume's participation in sex offender programming *as a result of* Rheaume's filing of lawsuits or grievances against them.  (Doc. 68 at 10–11.)  Defendants also assert that, given the circumstances of this case and Rheaume's filing of multiple other related cases, the delay or denial of Rheaume's participation in sex offender programming was not an adverse action under the First Amendment, but rather, was the result of either "the law pending at the time" or Rheaume's own "challeng[es] [to] his program requirements."  (*Id.* at 11.) As explained below, I find merit in these assertions.

Prisoners, like non-prisoners, have a constitutional right to access the courts and petition the government for the redress of grievances; and prison officials may not

retaliate against prisoners for the exercise of this right.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  The Second Circuit has cautioned, however, that "courts must approach prisoner claims of retaliation with skepticism and particular care," in part because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see Jackson v. Onondaga County*, 549 F. Supp. 2d 204, 214 (N.D.N.Y. 2008) ("Because of the relative ease with which [prisoner] claims of retaliation can be incanted . . . , courts have scrutinized [them] with particular care.").  Moreover, courts should carefully examine an inmate's First Amendment retaliation claims because they "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  *Dawes*, 239 F.3d at 491.  "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone."  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds in Swierkiewicz*, 534 U.S. 506.

Given these considerations, in order to survive a motion to dismiss, a prisoner asserting a First Amendment retaliation claim must make the following non-conclusory allegations: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Dawes*, 239 F.3d at 492; *see Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004); *Boddie v. Schnieder*, 105 F.3d 857, 862

(2d Cir. 1997) ("unsupported, speculative, and conclusory" retaliation claims properly dismissed).

### A.    Protected Conduct

It is well settled that "[p]risoners . . . have a constitutional right of access to the courts and to petition the government for the redress of grievances." *Colon*, 58 F.3d at 872 (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]nmates must be permit[ted] free and uninhibited access . . . to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers." (second and third alterations in original) (emphasis and internal quotation marks omitted)).  Rheaume alleges in the Second Amended Complaint that he "previously filed a[n] . . . action in this Court that included some of these same defendants and other VTDOC officials" (Doc. 57 at 3), and that he "grieved Defendant Bullard's [L]evel [C] designation to the VTDOC . . . and th[e]n filed a VRCP Rule 65 Injunction in the Vermont Superior court-Windsor Unit" (*id.* at 4, ¶ 5).[4]  Therefore, the Second Amended Complaint easily meets the first prong of the three-prong First Amendment retaliation test.

### B.    Adverse Action

The second prong of the test requires that Rheaume adequately plead that Defendants took "adverse action" against him.  In the prison context, the Second Circuit

---

[4] The Second Amended Complaint does not explicitly allege that Defendants' retaliation against Rheaume was based on his filing of one or more grievances, in addition to his filing of state and federal litigation.  For purposes of the pending Motion, however, I will treat the pleading as including both allegations, given the liberal standard applied to *pro se* complaints at the motion to dismiss stage, and given that the Second Amended Complaint asserts that Rheaume filed at least one grievance to the DOC during the relevant period.  (*See id.*)

has defined "adverse action" objectively, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill*, 389 F.3d at 381 (alteration in original) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  An inmate meets this requirement by "alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation." *Smith v. Maypes-Rhynders*, No. 07 Civ. 11241(PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009).  "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection."  *Dawes*, 239 F.3d at 493.  This objective test applies even where, as here, "a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."  *Gill*, 389 F.3d at 381.

Rheaume's claim that the *denial of or delay in allowing him to participate in* sex offender programming constitutes an "adverse action" is novel.  Most prisoner retaliation claims involving sex offender programming allege the opposite: that the *requirement that they attend* sex offender programming constitutes an adverse action.  *See, e.g.*, *Blake v. Fischer*, 2010 WL 2522198, at *8 ("Blake contends that as a result of his grievance against defendant . . . , he suffered the adverse action of having the [sex offender program] included in his file.").  In those cases, courts have found that such requirement does not constitute an adverse action.  One court explained:

> [R]ecommendation for [sex offender programming] does not constitute an
> adverse action.   The [sex offender program] is not a deprivation or
> punishment, rather it is a voluntary program which increases the chances of
> successful reintegration upon release.   Recommendation into a program
> does not constitute an action which would deter a similarly situated inmate
> from exercising his constitutional rights, specifically continuing to file
> grievances.

*Blake v. Elfeldt*, No. 09–CV–266 (DNH/CFH), 2012 WL 5830694, at *7 (N.D.N.Y.

Oct. 11, 2012), *report and recommendation adopted*, No. 9:09–CV–00266, 2012 WL

5830718 (N.D.N.Y. Nov. 16, 2012); *see also Donhauser v. Goord*, No. Civ.

901CV1535CNHGLS, 2003 WL 158765, at *3 (N.D.N.Y. Jan. 22, 2003) ("As the

defendants have pointed out, Donhauser has not suffered any adverse action for his

refusal to participate in the [sex offender program].").

I find that Rheaume's claims are sufficiently different from these cases, however,

and that the *withholding* of sex offender programming–even though not a constitutionally

protected liberty interest, as discussed above–could constitute an adverse action,

particularly where an inmate's attendance in the program might affect his parole status, as

Rheaume alleges.  *See Tuitt v. Chase*, No. 9:11–CV–0776 (DNH/TWD), 2013 WL

877439, at *8 (N.D.N.Y. Jan. 30, 2013) (where defendants "d[id] not dispute that

removing [p]laintiff from [sex offender program] constituted an 'adverse action,'"

complaint met second prong of retaliation test at motion to dismiss stage), *report and

recommendation adopted*, No. 9:11–CV–0776 (DNH/TWD), 2013 WL 877617

(N.D.N.Y. Mar. 8, 2013); *Bridges v. Hubbard*, No. CIV S–09–0940 TLN DAD P.,

2013 WL 3773886, at *10 (E.D. Cal. July 17, 2013) (adding prisoner's name to list "to

deny him participation in a program designed to return inmates to regular programming"
constituted adverse action), *report and recommendation adopted*, No. 2:09–cv–0940
TLN DAD P., 2013 WL 5230239 (E.D. Cal. Sept. 16, 2013).  Courts have held that
"negative parole recommendations," such as those alleged here, may constitute adverse
action for purposes of considering a retaliation claim at the motion to dismiss stage.  *See,
e.g.*, *Wolfe v. PA Dep't of Corr.*, 334 F. Supp. 2d 762, 774 (E.D. Pa. 2004) (denying
motion to dismiss retaliation claim, where inmate alleged defendants sought to impose
new prerequisites for parole on her because of her pursuit of administrative and legal
relief from the defendants' efforts to compel her to participate in sex offender program);
*but see Abram v. Corizon Health, Inc.*, No. 14–cv–11431, 2015 WL 998518, at *7
(E.D. Mich. Mar. 6, 2015) ("Abram does not cite any authority for the proposition that a
prisoner's removal from a Sexual Offender Program can constitute an adverse action, nor
is the Court aware of any such authority. . . .  Since Abram had no constitutional right to
participate in the Sexual Offender Program or to parole, his speculation that [his] one-
week transfer 'could have' caused him to be denied parole because he was not, during
that brief period, enrolled in the Sexual Offender Program, is immaterial." (citations
omitted)).

Also noteworthy, Defendants do not adequately address this issue in their Motion
or Reply, instead focusing on the "causal connection" prong of the First Amendment
retaliation test, which I address below.  Accordingly, I find that Rheaume has met the
second prong of the First Amendment retaliation test at this early stage of the case.

C.    **Causal Connection**

As to the third and final prong of the retaliation test—a causal connection between the protected conduct and the alleged retaliatory adverse action—I find that Rheaume has not alleged sufficient facts from which it can plausibly be inferred that his prior litigation and grievances filed against Defendants and the DOC were "a substantial or motivating factor" for Defendants' decision to delay or deny sex offender programming to Rheaume. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).  In addressing the causal connection requirement, a court may consider: (1) the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior disciplinary record, (3) vindication at a hearing on the matter, and (4) any statements by the defendants regarding their motives. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002); *see also Colon*, 58 F.3d at 872–73.  "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville*, 224 F. Supp. 2d at 732.

The Second Amended Complaint contains the following allegations of retaliation: Defendants "continued to retaliate" against Rheaume "because of [his] prior state and federal court cases against [D]efendants" (Doc. 57 at 7, ¶ 3); Defendants "have retaliated against [Rheaume] because of [his] prior state and federal court litigation in their decision not to ever release [him] on some type of community release program" (*id.* ¶ 4); Defendants "have retaliated against [Rheaume] because of [his] prior state and federal court litigation and their decision not to hold an[]other central office case staffing for another two years" (*id.* ¶ 5); Defendants "have retaliated against [Rheaume] because of

[his] prior state and federal court litigation in their decision on November 5, 2014 not to allow [him] to participate in the VTPSA sex offender program" (*id.* at 8, ¶ 6); and Defendants "have retaliated against [Rheaume] for his prior state and federal court litigation against some of the named [D]efendants in this case and the VTDOC officials in violation of [Rheaume's] First Amendment Rights" (*id.* ¶ 7).

In his Opposition to Defendants' Motion, Rheaume adds that Defendant Bullard "illegally invoked a [L]evel [C] classification on [Rheaume's] classification . . . because of [Rheaume's] litigation in *Rheaume v. Pallito*, Civil File No. 5[:]11–CV–72" (Doc. 70 at 5), and that "[a]s a form of retaliation," Defendants "continued to use the 7-High Risk VRAG score . . . to delay and deny [Rheaume's] entrance into the [V]TPSA sex offender program because of [Rheaume's] prior and current Court State and Federal litigation" (*id.* at 5–6). Rheaume further states that Defendants "retaliated against [him] for his case in *Rheaume v. Pallito*, Civil File No. 5:11–CV–72 when they invoked the [L]evel [C] designation on [his] classification." (*Id.* at 7.) Although Rheaume repeatedly states that Defendants' retaliated against him "because of" his filing of lawsuits and grievances, he has proffered no facts which plausibly suggest that such filing had any impact on Defendants' decision to delay or deny sex offender programming.

Temporal proximity between protected conduct and an adverse action is a factor supporting a causal connection. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that

protected activity was close in time to the adverse action.").[5]  But here, Rheaume has not alleged facts suggesting that the allegedly unlawful decisions made by Defendants at the November 2014 Central Office Case Staffing had any relationship to the lawsuits and grievances Rheaume filed before that date.  Rather, based on the allegations in the Second Amended Complaint, those decisions appear to have resulted from Defendants' attempts to follow the applicable DOC procedures, partly in response to Rheaume's filing of grievances and lawsuits.  Specifically, after a psychologist recommended Rheaume for sex offender programming in June 2014, the DOC reviewed Rheaume for programming and designated him a Level C offender in September 2014.  (Doc. 57 at 4–5.)  Rheaume grieved that designation, and as a result, he was returned to a Level B designation, and another Central Office Case Staffing was held in November 2014.  (*Id.*)  Although Rheaume alleges that, *for the past seven years*, Defendants have denied him entrance into sex offender programming (*id.* at 3), and further, that he was denied parole *in May 2014* because of his failure to complete sex offender programming (*id.* at 5, ¶ 10), the Second Amended Complaint also states that it was not until *June 2014* that a psychologist even recommended him for sex offender programming (*id.* ¶ 9).

---

[5]  Although timing is one factor to consider in the analysis, it would be *the only* factor alleged here; and the Second Circuit has held in the context of employment law that, where "timing is the only basis for a claim of retaliation, . . . an inference of retaliation does not arise."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  Because "[t]he Second Circuit routinely cites to employment cases when discussing retaliation in the prison law context," it is appropriate to apply the *Slattery* rule here.  *Tuitt*, 2013 WL 877439, at *9 (citing *Espinal*, 558 F.3d at 129).  Thus, even if the Second Amended Complaint properly alleged temporal proximity between the protected conduct and the alleged adverse action, it may still be insufficient because Rheaume has failed to allege other indices of a retaliatory motive.  *See Tuitt*, 2013 WL 877439, at *9 (dismissing retaliation claim regarding a correctional officer's failure to remove a "sex offender" sign from inmate's cell, where "[t]iming [wa]s the only basis for [the] claim"); *Edwards v. Horn*, No. 10 Civ. 6194(RJS)(JLC), 2012 WL 760172, at *18 (S.D.N.Y. Mar. 8, 2012) ("Apart from any apparent temporal proximity, . . . Edwards' allegations are wholly conclusory and should be dismissed.").

Mindful that the Second Circuit has advised district courts to be wary of retaliation claims because, as noted above, "virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act," *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 491), I find that the allegations contained in Rheaume's complaint fail to plausibly suggest a causal connection between the litigation and grievances filed by Rheaume against Defendants, and Defendants' decision to delay or deny Rheaume's participation in sex offender programming. Accordingly, I recommend that Rheaume's First Amendment retaliation claim be DISMISSED.

## V.      Personal Involvement of Defendants Pallito and Potanas

Defendants assert that Rheaume's claims against Defendants Commissioner Pallito and Superintendent Potanas in their individual capacities should be dismissed because the Second Amended Complaint fails to allege facts sufficient to show they were personally involved in any alleged unlawful conduct.  (Doc. 68 at 6–8.)  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (quoting *Colon*, 58 F.3d at 873).  In order to obtain damages against an individual under § 1983, a plaintiff must show some "tangible connection" between the constitutional violation alleged and that particular defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  To establish personal involvement, the plaintiff must allege facts from which the Court can plausibly infer that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

In the Second Amended Complaint, Rheaume alleges that Pallito is liable for his "failure to train and properly supervise" the other Defendants with respect to their conduct at the November 2014 Central Office Case Staffing.  (Doc. 57 at 8, ¶ 8.)  The Complaint contains no specific allegations regarding Potanas.  In his Opposition to Defendants' Motion, however, Rheaume states that Potanas was notified of the relevant grievances but gave a "false statement" in response, and that Potanas "failed to take any corrective measures and actions [to] place [Rheaume] in [the] VTPSA program."  (Doc. 70 at 10.)  Rheaume further states that Pallito was also notified of the relevant grievances, but failed to properly manage his subordinates, failed to correct Defendant Dunsmore's illegal VRAG assessment, failed to correct "the Central Office Defendants['] use of the illegal 7-High Risk VRAG assessment," and generally "failed to take any corrective actions regarding the VRAG assessment."  (*Id.* at 9.)

These alleged facts would normally be sufficient to support personal-involvement claims against Defendants Pallito and Potanas at the motion-to-dismiss stage.  *See Grullon v. City of New Haven*, 720 F.3d 133, 140–41 (2d Cir. 2013); *King v. McIntyer*, No. 9:11–CV–1457, 2014 WL 689028, at *9 (N.D.N.Y. Feb. 20, 2014).  However, given

that the Second Amended Complaint alleges no viable constitutional claims, as discussed above, Pallito and Potanas cannot have participated in, and therefore cannot be held liable for, any constitutional violations.  *See, e.g.*, *Romagnano v. Town of Colchester*, 354 F. Supp. 2d 129, 137 (D. Conn. 2004) ("The Court having found no constitutional violation, there can be no personal liability of [the Commissioner of Public Safety] in his role as Commissioner."); *Jackson v. Buckman*, 756 F.3d 1060, 1067 n.3 (8th Cir. 2014) ("Absent an underlying constitutional violation, [plaintiff's] official-capacity and failure-to-supervise claims against [sheriff of county where plaintiff was incarcerated and chief of detention at detention facility where plaintiff was incarcerated] necessarily fail."); *Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 747 (10th Cir. 2013) ("Denial of a grievance or failure to properly investigate or process grievances, without any connection to the violation of constitutional rights . . . , is not sufficient to establish personal participation for purposes of a Section 1983 claim.").  Thus, Rheaume's claims against Defendants Pallito and Potanas in their individual capacities should be DISMISSED.

## VI.    Allegations Against Defendant Dunsmore

As noted earlier, Rheaume alleges in the Second Amended Complaint that Defendant Dunsmore "illegally complete[d] a VRAG assessment on [Rheaume's offense] . . . and designated [Rheaume] a high risk violent offender" (Doc. 57 at 6, ¶ 14), despite not having the authority or qualifications to complete the VRAG assessment (*id.*, ¶ 15). Rheaume asserts in his Opposition that Defendants "did not deny or oppose" this claim in their Motion to Dismiss.  (Doc. 70 at 8.)  However, the claim relies on the success of Rheaume's Fourteenth Amendment due process claim, which I have found unsupported

32

because Rheaume does not possess a liberty interest in sex offender programming.  Given

that finding, I also find Rheaume's claim regarding Dunsmore's completion of the

VRAG assessment unsupported.  *See Taylor v. Levesque*, 246 F. App'x 772, 774 (2d Cir.

2007) ("It is well settled that prisoners generally do not have a protected liberty interest

in classifications that impact their eligibility to participate in rehabilitative programs."

(citing *Moody*, 429 U.S. at 88 n.9; *Pugliese*, 617 F.2d at 923)); *Blake v. Fischer*, No. 09–

CV–266 (DNH/DRH), 2010 WL 2522198, at *11 (N.D.N.Y. Mar. 5, 2010) ("[I]nmates

have no constitutionally protected liberty interest in internal classifications or eligibility

for rehabilitative programs."); *Rheaume v. Pallito*, 2011 VT 72, ¶ 11, 190 Vt. 245,

30 A.3d 1263 (concluding programming requirements imposed on high-risk prisoner,

including requirement that he complete sex offender treatment, are a matter of DOC

discretion, not reviewable by the court under Vermont law).  Thus, Rheaume's claim

against Defendant Dunsmore should be DISMISSED.

## VII.    Leave to Amend

Where a *pro se* complaint fails to state a cause of action, the court generally

"should not dismiss without granting leave to amend at least once when a liberal reading

of the complaint gives any indication that a valid claim might be stated."  *Cuoco v.

Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks omitted).  An

opportunity to amend is not required, however, where the plaintiff has already amended

the complaint.  *Id.*; *see also Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F.Supp.2d

375, 384 (S.D.N.Y. 1998) (denying leave to amend where plaintiff had already amended

complaint once).  Nor is leave to amend required where "[t]he problem with [the

complaint] is substantive," such that "better pleading will not cure it."  *Cuoco*, 222 F.3d at 112.  Rheaume has amended his complaint twice.  Moreover, he has neither requested amending for a third time, nor stated facts that may cure the Second Amended Complaint's defects.  I find that amendment would be futile, and thus recommend denying leave to amend.

### Conclusion

The Second Circuit has repeatedly held that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."  *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987).  Because Rheaume does not have a liberty interest in attending sex offender programming, he has failed to state allegations of fact indicating that a deprivation of rights occurred.  Moreover, his claim that he was denied parole solely because of his failure to attend sex offender programming, and conversely that he would be granted parole if he attended programming, is hypothetical, given that the standard for being paroled is whether "there is a reasonable probability that the inmate can be released without detriment to the community or to the inmate."  28 V.S.A. § 502a(b)(2).

For these reasons and the additional reasons explained above, I recommend that Defendants' Motion to Dismiss (Doc. 68) be GRANTED, and Rheaume's Second Amended Complaint (Doc. 57) be DISMISSED in its entirety without leave to amend, as Rheaume has failed to state a claim for which relief can be granted under the Fourteenth or First Amendments, and a third amendment would be futile.

Dated at Burlington, in the District of Vermont, this 19th day of April, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).